**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Shawn Patton, | : | Case No. 1:13 CV 68 |
| | : | |
|      Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| | : | **RECOMMENDATION** |
|      Defendant, | | |

**I. INTRODUCTION**

Plaintiff Shawn Patton ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination terminating his

receipt of Disability Insurance Benefits ("DIB") effective November 1, 2006 (Docket No. 1).  Pending

are the parties' Briefs on the Merits (Docket Nos. 9 and 10). For the reasons that follow, the Magistrate

recommends the decision of the Commissioner be affirmed.

**II. PROCEDURAL BACKGROUND**

On April 30, 2002, Plaintiff filed an application for a period of DIB under Title II of the Social

Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 7, p. 84 of 578). In his application, Plaintiff

alleged a period of disability beginning April 11, 2001, resulting from epilepsy (Docket No. 7, p. 84 of

578). On November 18, 2002, the Commissioner found Plaintiff disabled, with an onset date of

1

January 1, 2002 (Docket No. 7, p. 49 of 578).

On November 27, 2006, Plaintiff received a letter informing him that, given his recent medical improvement, his DIB was terminated, effective November 1, 2006 (Docket No. 7, pp. 50, 53-55 of 578). Plaintiff objected to this termination and requested reconsideration (Docket No. 7, pp. 56, 58 of 578). On April 7, 2008, the Commissioner affirmed the termination of Plaintiff's DIB (Docket No. 7, p. 52 of 578). Plaintiff was informed of this decision via letter on April 14, 2008 (Docket No. 7, p. 69 of 578). Plaintiff thereafter filed a timely written request for a hearing on July 3, 2008 (Docket No. 7, p. 73 of 578).

On April 16, 2009, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Alfred V. Lucas ("ALJ Lucas") (Docket No. 7, pp. 43-46 of 578). Also appearing at the hearing was an impartial Vocational Expert ("VE") Bruce Holderead ("Mr. Holderead") (Docket No. 7, p. 31 of 578). In a decision dated October 27, 2009, ALJ Lucas affirmed the termination of Plaintiff's DIB (Docket No. 7, pp. 31-40 of 578). Plaintiff appealed (Docket No. 7, p. 375 of 578).

On May 19, 2011, after reviewing the previously submitted evidence, as well as new medical reports, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings (Docket No. 7, p. 372 of 578). In its order of remand, the Appeals Council directed ALJ Lucas to consider the new evidence, obtain Plaintiff's updated medical records, procure testimony from a medical expert, and, if necessary, obtain a consultative physical and/or mental status examination and updated VE testimony (Docket No. 7, p. 373 of 578).

On January 9, 2012, Plaintiff again appeared with counsel for an administrative hearing before ALJ Lucas (Docket No. 7, pp. 544-78 of 578). During this hearing, the ALJ heard testimony from Plaintiff, his wife Kerri Patton ("Mrs. Patton"), and medical expert Hershel Goren ("Dr. Goren")

(Docket No. 7, pp. 544-78 of 578). ALJ Lucas also requested the presence of VE Kevin Z. Yi ("VE Yi"), but ultimately opted not to take his testimony (Docket No. 7, pp. 544-78 of 578). In a decision dated February 21, 2012, ALJ Lucas again determined Plaintiff had shown sufficient medical improvement so as to terminate DIB as of November 1, 2006 (Docket No. 7, pp. 13-27 of 578). Plaintiff's request for continued benefits was therefore denied (Docket No. 7, p. 27 of 578). This decision was upheld by the Appeals Council on November 20, 2012 (Docket No. 7, pp. 8-11 of 578).

On January 10, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his termination of DIB (Docket No. 1). On January 11, 2013, Plaintiff filed an Amended Complaint (Docket No. 5). In his pleading, Plaintiff alleged the ALJ: (1) failed to comply with the Appeals Council's remand instructions; and (2) should have extended Plaintiff's DIB through July 31, 2009, the day Plaintiff had corrective surgery (Docket No. 9). Defendant filed its Answer to the Amended Complaint on March 12, 2013 (Docket No. 6).

### III. FACTUAL BACKGROUND

**A.    MEDICAL RECORDS[1]**

Plaintiff's medical records for the relevant time period date back to May 14, 2008, when Plaintiff saw Dr. Diosely Silveira, MD ("Dr. Silveira") complaining of seizures (Docket No. 7, p. 311 of 578). At that time, Plaintiff reported last having a seizure two weeks prior to the appointment (Docket No. 7, p. 311 of 578). His longest seizure-free interval was ten months, which occurred in 2007 (Docket No. 7, p. 311 of 578). Plaintiff denied any aura during his seizures, but noted he sometimes experienced tongue-biting and incontinence (Docket No. 7, p. 311 of 578). Mrs. Patton

---

[1] Plaintiff's medical records regarding his epilepsy are voluminous. However, given the current claim before this Court, that is, Plaintiff's award of DIB for a closed period, this opinion will address only those medical records from the relevant time period: November 1, 2006, through July 31, 2009.

described Plaintiff's nighttime seizures as lasting two to three minutes (Docket No. 7, p. 311 of 578).

Dr. Silveira diagnosed Plaintiff with focal epilepsy (Docket No. 7, p. 313 of 578).

On October 1, 2008, Plaintiff began a seven-day period of nighttime video and electroencephalogram ("EEG") monitoring (Docket No. 7, pp. 319-344 of 578). At this time, Plaintiff reported being seizure-free for at least two months, with his last daytime episode occurring two months prior to the appointment (Docket No. 7, pp. 323, 337, 344 of 578). Plaintiff noted he had gone even longer without a nighttime seizure, his last episode being three months prior to the appointment (Docket No. 7, pp. 323, 337, 344 of 578). Plaintiff had only one seizure during this monitoring period (Docket No. 7, pp. 319, 325 of 578). A brain MRI showed malformations of the cortical development involving the posterior portion of the right superior temporal gyrus and sulcus (Docket No. 7, pp. 320, 328 of 578). A PET scan showed a focal area of hypo-metabolism of the left hemisphere (Docket No. 7, p. 331 of 578). Combined, these lab results were suggestive of an epileptogenic focus[2] (Docket No. 7, p. 320 of 578).

Plaintiff's records then jump to April 27, 2009, when Plaintiff underwent a successful stereotactic localization and implantation of multiple depth electrodes in his brain (Docket No. 7, p. 441 of 578). These electrodes allowed continuous EEG monitoring of Plaintiff's brain activity from April 29, 2009, through May 21, 2009 (Docket No. 7, p. 444 of 578). Although results showed Plaintiff had very frequent subclinical seizures, he did not have any habitual or spontaneous seizures during this time (Docket No. 7, p. 435 of 578). Nor did Plaintiff's brain react to direct electrical stimulation of the electrodes (Docket No. 7, p. 435 of 578). Following completion of the test, a

---

[2] The area of the cortex of the brain responsible for producing epileptic seizures; a place in the brain which initiates an epileptic seizure. ATTORNEYS' DICTIONARY OF MEDICINE, E-40636 (2009).

decision was made that Plaintiff would undergo a lesionectomy (Docket No. 7, p. 435 of 578). Plaintiff had this procedure on July 31, 2009.

Since the surgery, Plaintiff admits he is seizure-free and doing well (Docket No. 7, pp. 509, 520 of 578). In fact, his last seizure episode occurred one hour after his surgery (Docket No. 7, p. 512 of 578). Plaintiff was released to return to work on January 27, 2010 (Docket No. 7, p. 510 of 578). By May 2010, Plaintiff was driving (Docket No. 7, p. 523 of 578), and, by October 2010, Plaintiff had stopped taking his medications altogether (Docket No. 7, p. 524 of 578).

## B.    EVALUATIONS

### 1.    PSYCHIATRIC REVIEW TECHNIQUES

Plaintiff underwent two Psychiatric Review Techniques, one in November 2006 with state examiner Dr. Karen Terry, Ph.D ("Dr. Terry") (Docket No. 7, pp. 251-264 of 578), and a second evaluation in March 2007 with state examiner Dr. Douglas J. Pawlarczyk, Ph.D ("Dr. Pawlarczyk") (Docket No. 7, pp. 281-94 of 578). Both examiners concluded that Plaintiff did not suffer from any medically determinable impairment (Docket No. 7, pp. 251, 281 of 578).

### 2.    PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS

Also during 2006 and 2007, Plaintiff underwent two Physical Residual Functional Capacity Assessments with state examiners Dr. E.S. Villanueva, MD ("Dr. Villanueva") and Dr. Cindi Lynn Hill, MD ("Dr. Hill") (Docket No. 7, pp. 265-72, 273-80 of 578). Both examiners concluded Plaintiff had no exertional, manipulative, visual, communicative, or environmental limitations (Docket No. 7, pp. 266-69, 274-77 of 578). Plaintiff was only otherwise limited to never climbing ladders, ropes, or scaffolds, and avoiding all exposure to hazards like machinery and heights (Docket No. 7, pp. 266-69, 274-77 of 578).

3.    INITIAL PSYCHIATRIC EVALUATION

On October 22, 2008, Plaintiff underwent an initial psychiatric evaluation with Dr. George E. Tesar, MD ("Dr. Tesar") (Docket No. 7, pp. 304-05 of 578). Plaintiff admitted to currently smoking marijuana and experimenting with acid and cocaine in the past, but denied any current substance use or abuse (Docket No. 7, p. 304 of 578). Plaintiff also acknowledged a significant history of alcohol use (Docket No. 7, p. 304 of 578). Dr. Tesar diagnosed Plaintiff with an adjustment disorder with disturbance of conduct and emotions, cannabis abuse/dependence, alcohol dependence/abuse in remission, intermittent explosive disorder in remission, and personality disorder with paranoid features (Docket No. 7, p. 305 of 578). He assigned Plaintiff a Global Assessment of Functioning ("GAF") Score of seventy[3] (Docket No. 7, p. 305 of 578).

4.    NEUROPSYCHOLOGICAL EVALUATION

On March 19, 2009, Plaintiff underwent a neuropsychological evaluation with Dr. Jennifer S. Haut, Ph.D ("Dr. Haut") to evaluate his eligibility for epilepsy surgery (Docket No. 7, pp. 295-96 of 578). Plaintiff reported some cognitive difficulties, including increasing word-retrieval difficulties, forgetfulness, inability to place long-term acquaintances, vocabulary loss, and frustration related to his epilepsy and resulting restrictions (Docket No. 7, p. 295 of 578). At that time, Plaintiff was unemployed, but taking care of his four children, ages six, three (twins), and one (Docket No. 7, p. 295 of 578). Dr. Haut found Plaintiff to have some difficulties finding words, but no significant motor difficulties (Docket No. 7, p. 296 of 578). He also had reduced performance bilaterally on measures of

_____

[3]  The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of seventy indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

6

fine motor dexterity (Docket No. 7, p. 296 of 578). Plaintiff's performance on all remaining cognitive measures was within the average to high-average range, as were his basic language skills (Docket No. 7, p. 296 of 578). Plaintiff's cognitive processing speed was within normal limits and he exhibited intact executive functions, with the exception of reduced verbal abstract performance (Docket No. 7, p. 296 of 578). His attention to and recognition of visual detail was very superior, as was his relative strength with visual spatial reasoning without time constraints (Docket No. 7, p. 296 of 578). Dr. Haut diagnosed Plaintiff with significant depression, overt stress/distress, social isolation, and a preoccupation with his physical concerns (Docket No. 7, p. 296 of 578).

## C.    THE SECOND ADMINISTRATIVE HEARING

A second administrative hearing convened on January 9, 2012, in Cleveland, Ohio (Docket No. 7, pp. 544-578 of 578). Plaintiff, represented by counsel Glen Richardson, appeared and testified (Docket No. 7, pp. 546-50 of 578). Also present and testifying was medical expert Dr. Goren (Docket No. 7, pp. 550-70 of 578), and Plaintiff's wife, Mrs. Patton.  Vocational Expert (VE) Kevin Yi also appeared but did not testify  (Docket No. 7, pp. 570-78 of 578).

### 1.    PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was thirty-three years old, married, and attending college two days per week (Docket No. 7, pp. 546-47 of 578). Plaintiff testified he dropped out of school in the tenth grade but had recently obtained his GED (Docket No. 7, p. 547 of 578). When asked about his seizures, Plaintiff indicated he had not had an episode since his surgery (Docket No. 7, p. 548 of 578). Plaintiff also admitted that, given his surgery, he was able to return to work (Docket No. 7, p. 549 of 578).

### 2. MEDICAL EXPERT'S TESTIMONY

During his testimony, Dr. Goren testified that his job was to assess whether Plaintiff met the criteria found in Social Security Listings 11.02 and 11.03, which describe convulsive and non-convulsive epilepsy, respectively (Docket No. 7, p. 551 of 578). Dr. Goren noted Plaintiff's gradual improvement, and discussed Plaintiff's medical records, statements, and Mrs. Patton's diary documenting Plaintiff's seizures and symptoms (Docket No. 7, pp. 550-70 of 578). Based on his review of Plaintiff's records, Dr. Goren concluded that Plaintiff did not meet the frequency criteria of either Listing (Docket No. 7, p. 551 of 578).

On cross examination, counsel questioned Dr. Goren as to whether the combination of Plaintiff's non-convulsive and convulsive seizures would at least equal either Listing 11.02 or 11.03 (Docket No. 7, p. 560 of 578). Dr. Goren stated that, according to his reading and understanding of the Listings, each type of seizure had to be addressed separately, although the ALJ was free to disagree with that interpretation (Docket No. 7, p. 561 of 578).

### 3. MRS. PATTON'S TESTIMONY

Mrs. Patton testified that she began keeping a diary of Plaintiff's seizures, both convulsive and non-convulsive, at the request of counsel (Docket No. 7, pp. 570-71 of 578). She described Plaintiff's convulsive seizures as "a complete loss of body and lots of jerking. And he'd often lose his bladder. Sounded like choking. There were – it's just a lot of flailing" (Docket No. 7, p. 571 of 578). Mrs. Patton indicated these seizures occurred approximately once per month (Docket No. 7, p. 576 of 578). With respect to Plaintiff's non-convulsive seizures, Mrs. Patton stated "I'd be talking to him and ask a question, and he would be looking off into space, not paying attention to what I was saying, not hearing what I was saying. And that happened quite a bit" (Docket No. 7, p. 571 of 578). Mrs. Patton

8

testified she only recorded Plaintiff's episodes when she was with him and only if she noticed "things were going on" (Docket No. 7, p. 573 of 578). She also stated that, during the time she kept the diary, she was in school three hours per day and worked twenty hours per week (Docket No. 7, p. 574 of 578).

## IV. STANDARD OF DISABILITY

In cases where a current DIB recipient is challenging the cessation of his disability benefits, the central issue is whether the recipient's medical impairments have improved to the point where he or she is able to perform substantial gainful activity. 42 U.S.C. § 423(f)(1). Therefore, the evaluation of any such improvement is a two-part process. *See Kennedy v. Astrue*, 247 F.App'x 761, 764 (6th Cir. 2007). First, the Commissioner must determine if the recipient has experienced actual medical improvement. For purposes of Social Security, medical improvement is "any decrease in the medical severity of [the recipient's] impairment(s) . . ." 20 C.F.R. § 404.1594(b)(1). Improvement is measured against a baseline status of the recipient's impairment(s), which is determined as of the date of the recipient's "most recent favorable medical decision that [the recipient] was disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1)(i). This determination "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the recipient's] impairment(s)." 20 C.F.R. § 404.1594(b)(1).

The second part of the cessation analysis focuses on whether, based on his or her medical improvement, the recipient has the ability to engage in substantial gainful activity. *Kennedy*, 247 F.App'x at 765. Medical improvement is only related to a recipient's ability to do work if "there has been a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision and an increase in [the recipient's] functional capacity to do basic work activities."

9

20 C.F.R. § 416.994(b)(1)(iii). At this stage, the Commissioner must incorporate the standards set forth in the regulations governing *initial* disability determinations. *See* 20 C.F.R. § 404.1594(b)(5), (7). The difference between initial and termination determinations is that, in termination proceedings, the ultimate burden of proof rests with the Commissioner. *Kennedy*, 247 F.App'x at 765. An increase in the recipient's residual functional capacity will lead to a cessation of benefits only if, as a result of this increase, the recipient can perform other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1594(f)(8), 416.994(b)(5)(viii).

To determine whether a recipient's entitlement to disability benefits has ended, the Commissioner uses the eight-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1594(f)(1)-(8), 416.994(b)(5)(i)-(viii). *See Kennedy*, 247 F.App'x at 764. First, the Commissioner must determine whether the recipient is currently engaging in substantial gainful activity and, if not, whether the disability continues because the recipient's impairment(s) meet or equal the severity of a listed impairment. 20 C.F.R. § 404.1594(f)(1), (2). Next, the Commissioner must determine whether there has been any medical improvement. 20 C.F.R. § 404.1594(f)(3). If so, the Commissioner must determine whether the medical improvement is related to the recipient's ability to work. 20 C.F.R. § 404.1594(f)(4). If there has been no medical improvement or if the improvement is *not* related to the recipient's ability to work, the Commissioner must determine whether any exception to medical improvement applies. 20 C.F.R. § 404.1594(f)(5). If there *is* medical improvement related to the recipient's ability to work, the Commissioner must determine whether all of the recipient's current impairments in combination are severe. 20 C.F.R. § 404.1594(f)(6). If the impairment or combination of impairments is severe, the Commissioner must determine whether the recipient has the residual functional capacity to perform any of his or her past relevant work. 20 C.F.R. § 404.1594(f)(7).

10

Finally, if the recipient is unable to do past relevant work, the Commissioner must determine whether he or she can perform other work. 20 C.F.R. §§ 404.1594(f)(8). There is no presumption of continuing disability. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286-87 n.1 (6th Cir. 1994).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Lucas made the following findings:

1.  The most recent favorable medical decision finding that Plaintiff was disabled is the determination dated October 9, 2002. This is known as the comparison point decision ("CPD").

2.  At the time of the CPD, Plaintiff had the following medically determinable impairments: organic mental disorder (i.e. dementia), and epilepsy. These impairments were found to cause Plaintiff to be markedly limited in his ability to complete a workweek without interruptions from psychological symptoms.

3.  Through November 1, 2006, the date Plaintiff's disability ended, Plaintiff engaged in periods of substantial gainful activity.

4.  The medical evidence establishes that as of November 1, 2006, Plaintiff had the following medically determinable impairments: organic mental disorder, epilepsy, and depression.

5.  Since November 1, 2006, Plaintiff has not had an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

6.  Medical improvement occurred as of November 1, 2006.

7.  Plaintiff's medical improvement is related to the ability to work because it resulted in an increase in Plaintiff's residual functional capacity.

8.  As of November 1, 2006, Plaintiff continued to have a severe impairment or combination of impairments.

9.  Based on the impairment present as of November 1, 2006, Plaintiff had the residual functional capacity to perform a reduced range of light work with the following nonexertional limitations: avoid driving automotive equipment, avoid unprotected heights, dangerous or moving machinery, cannot climb ladders, ropes, or scaffolds.

11

10.     As of November 1, 2006, Plaintiff was unable to perform past relevant work.

11.     On November 1, 2006, Plaintiff was a younger individual age 18-49.

12.     Plaintiff has a limited education and is able to communicate in English.

13.     Beginning on November 1, 2006, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is not disabled, whether or not Plaintiff has transferable job skills.

14.     As of November 1, 2006, considering Plaintiff's age, education, work experience, and residual functional capacity, and based on the impairments present as of November 1, 2006, Plaintiff was able to perform a significant number of jobs in the national economy.

15.     Plaintiff's disability ended as of November 1, 2006.

(Docket No. 7, pp. 16-27 of 578). ALJ Lucas denied Plaintiff's request for continuation of benefits for the closed period beginning November 1, 2006, and running through July 31, 2009 (Docket No. 7, pp. 26-27 of 578).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

12

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.   PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges the ALJ: (1) failed to comply with the Appeals Council's remand instructions; and (2) should have extended Plaintiff's DIB through July 31, 2009, the day Plaintiff had corrective surgery (Docket No. 9).

### B.   DEFENDANT'S RESPONSE

Defendant alleges the ALJ fully complied with the Appeals Council's instructions (Docket No. 10, pp. 11-13 of 20). Furthermore, Defendant contends that there is substantial evidence to support the ALJ's finding that Plaintiff did not meet the epilepsy Listings after November 1, 2006 (Docket No. 10, pp. 13-17 of 20).

### C.   DISCUSSION

#### 1.   REMAND ORDER

Plaintiff contends the ALJ erred by failing to follow the directives of the Appeals Council (Docket No. 9, pp. 5-8 of 16). Specifically, Plaintiff argues that the ALJ failed to obtain a consultative physical and/or mental examination to clarify the additional evidence (Docket No. 9, pp. 7-9 of 16).

While Plaintiff is correct that the ALJ did not order a physical and/or mental consultative examination of Plaintiff, a review of the record and the supplemental evidence makes clear that such an examination was unnecessary.

Plaintiff's original administrative hearing occurred in April 2009, three months prior to Plaintiff's successful lesionectomy (Docket No. 7, p. 31 of 578). Although ALJ Lucas did not issue his decision until October 2009, there is no indication in his opinion that he received or reviewed any evidence concerning Plaintiff's surgery or the results of Plaintiff's month-long depth electrode monitoring, which occurred from April 29, 2009, through May 21, 2009 (Docket No. 7, pp. 31-40 of 578). This evidence only came to light after the October 2009 decision and before the Appeals Council's May 2011 review. Given this new evidence, the Appeals Council vacated the ALJ's decision and remanded Plaintiff's case for further review (Docket No. 7, p. 372 of 578). In its order, the Appeals Council directed the ALJ to

> . . . consider the new evidence and take appropriate action to resolve the issues cited above and any other issues which the [ALJ] finds to be appropriate, in accordance with the applicable Social Security Administration regulations and Rulings.
>
> As appropriate, the [ALJ] will obtain updated medical records from the claimant's treating and other medical sources, including clinical findings, test results, and medical source statements about what the claimant can do despite the impairment(s). The claimant's representative may be enlisted as necessary in securing the additional evidence. If the evidence does not adequately clarify the record, the [ALJ] will recontact the medical source(s) for further information.
>
> If the additional evidence does not clearly depict the claimant's limitations, the [ALJ] will obtain a consultative physical and/or mental status examination, including a medical source statement about what the claimant can do despite the impairment(s) . . .
>
> As appropriate, the [ALJ] will obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairment(s).

(Docket No. 7, p. 373 of 578).

14

Review of the Appeals Council's remand order shows that whether or not to send Plaintiff for a consultative examination was left well within the sole discretion of the ALJ. The order reads "if the additional evidence does not clearly depict the claimant's limitations, the [ALJ] will obtain a consultative physical and/or mental status examination . . . ." (Docket No. 7, p. 373 of 578). It does not *mandate* the examination regardless. Given the language of the remand order, the ALJ's decision was reasonable and appropriate.

Furthermore, it is unclear as to how much help a consultative examination done in January 2012 would have been. By his own admission, Plaintiff's epilepsy ceased to exist immediately following his July 2009 lesionectomy (Docket No. 7, pp. 548-49 of 578). Therefore, in January 2012, Plaintiff would have been a fully-functioning, impairment-free adult capable of substantial gainful activity. A consultative examination would not have rewound the hands of time to determine what Plaintiff was capable of prior to his surgery during the relevant time period. This is evidenced in Plaintiff's August 2011 state-ordered evaluation with Dr. Dariush Saghafi, MD ("Dr. Saghafi") (Docket No. 7, pp. 493-95 of 578). Dr. Saghafi found that Plaintiff had remained seizure-free since his surgery, and was able to "lift, push, and pull sufficiently to be able to perform [activities of daily living] as well as routine physical labor . . . bend, walk, and stand . . . understand the environment as well as peers and communicate satisfactorily . . . [and] travel independently" (Docket No. 7, p. 495 of 578). Based on the date and findings of Dr. Saghafi's evaluation, there was really no need for ALJ Lucas to order another consultative examination.

Therefore, Plaintiff's assignment of error is without merit and the Magistrate recommends the Commissioner's decision be affirmed.

2.     **CONTINUATION OF BENEFITS THROUGH JULY 31, 2009**

Plaintiff next argues that the evidence shows he was disabled beyond November 1, 2006, until

July 31, 2009, given the type and frequency of his seizures (Docket No. 9, pp. 9-14 of 16). Defendant

denies this allegation (Docket No. 10, pp. 13-17 of 20). Plaintiff's argument is without merit.

When determining whether a claimant is disabled for purposes of awarding disability, the

Commissioner must determine whether one, or a combination of more than one, of a claimant's severe

impairments either meets or are equivalent in severity to one or more the "listed" medical conditions.

20 C.F.R. §§ 404.1520(d), 416.920(d). These "listed" medical conditions "describes for each of the

major body systems impairments that [the Social Security Administration] consider[s] to be severe

enough to prevent an individual from doing any gainful activity, regardless of . . . her age, education,

or work experience." 20 C.F.R. § 404.1525(a). Within each listing, the Social Security Administration

specifies the medical and other findings needed to satisfy the criteria of that particular listing. 20

C.F.R. § 404.1525(c)(3). A claimant's impairment meets a listed impairment only when it manifests

the specific findings described in the set of medical criteria for the particular listed impairment. 20

C.F.R. §§ 404.1525(d), 416.925(d). "For a claimant to show that his impairment matches a listing, it

must meet *all* of the specified medical criteria. An impairment that manifests only some of those

criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)

(emphasis in original). It is the claimant's burden to bring forth evidence to establish that she meets or

equals a listed impairment. *See Evans v. Sec'y of Health and Human Servs.*, 820 F.2d 161, 164 (6th

Cir. 1981) (per curiam).

Plaintiff's epileptic seizures are found generally under Listing 11.00: Neurological

Impairments (Docket No. 9). In the introduction to this section, the Social Security Administration

16

states:

> [i]n epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures. At least one detailed description of a typical seizure is required. Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

20 C.F.R. Part 404, Subpart P, Appendix 1, 11.00(A).

Plaintiff's specific impairments are found under Listings 11.02 and 11.03, which set forth the criteria for convulsive and non-convulsive seizures, respectively. These criteria "can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy." 20 C.F.R. Part 404, Subpart P, Appendix 1, 11.00(A).

Under Listing 11.02 (convulsive seizures), Plaintiff must provide documentation that includes a detailed description of a typical seizure pattern, including all associated phenomena, *occurring more frequently than once a month* in spite of at least three months of prescribed treatment with: (1) daytime episodes (loss of consciousness and convulsive seizures); or (2) nocturnal episodes manifesting residuals which interfere significantly with activity during the day. 20 C.F.R. Part 404, Subpart P, Appendix 1, 11.02.

Under Listing 11.03 (non-convulsive seizures), Plaintiff must provide documentation that includes a detailed description of a typical seizure pattern, including all associated phenomena, *occurring more frequently than once weekly* in spite of at least three months of prescribed treatment. 20 C.F.R. Part 404, Subpart P, Appendix 1, 11.03. Plaintiff must also show "alteration of awareness or

17

loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. Part 404, Subpart P, Appendix 1, 11.03.

Here, ALJ Lucas provided two reasons for finding that Plaintiff's impairment did not meet the criteria of either Listing 11.02 or 11.03: (1) Dr. Goren's testimony concluding that Plaintiff did not meet the frequency criteria of either Listing; and (2) Plaintiff's non-compliance with medical treatment (Docket No. 7, p. 20 of 578). Although Plaintiff's compliance with medical treatment is somewhat unclear during the relevant time period, the ALJ had sufficient evidence to deny Plaintiff's claim on the frequency issue alone.

During his testimony, Dr. Goren went through, in comprehensive detail, Plaintiff's frequency of both convulsive and non-convulsive seizures during the relevant time period (Docket No. 7, pp. 550-70 of 578). To begin, Dr. Goren noted that Plaintiff had no medical records from November 1, 2006, through May 2008 (Docket No. 7, p. 556 of 578). On May 14, 2008, Plaintiff told Dr. Silveira that his most recent seizure had occurred two weeks prior, at the beginning of May (Docket No. 7, p. 311 of 578). Plaintiff also indicated his longest seizure-free interval was ten months, which occurred in 2007 (Docket No. 7, p. 311 of 578). During an October 2008 meeting with Dr. Silveira, immediately prior to his nighttime video and EEG testing, Plaintiff indicated his last nighttime episode was three months prior and his last daytime episode was two months prior to the appointment (Docket No. 7, pp. 323, 337, 344 of 578). Therefore, it is clear Plaintiff was not having either convulsive or non-convulsive seizures at a frequency sufficient to satisfy the Listings during the relevant period (Docket No. 7, p. 23 of 578).

Plaintiff relies upon a diary kept by Mrs. Patton with regard to the frequency of his seizures (Docket No. 9, pp. 9-10 of 16). This diary ran from January 7, 2009, through April 15, 2009, and

18

tracked Plaintiff's seizure episodes (Docket No. 7, pp. 148-51 of 578). Examining Mrs. Patton's diary, it is clear that Plaintiff only experienced three documented convulsive seizures during this time, on January 7, 2009, March 14, 2009, and April 14, 2009 (Docket No. 7, pp. 148-51 of 578). This translates to three seizures during an approximate fourteen-week span, which is clearly less than the "more than once per month" frequency required by Listing 11.02. 20 C.F.R. Part 404, Subpart P, Appendix 1, 11.02. With regard to non-convulsive seizures, and giving Plaintiff the benefit of the doubt by assuming Mrs. Patton's description of "zone-out" and "unresponsive" indicated a non-convulsive seizure, both Dr. Goren and the ALJ found Plaintiff experienced only twelve episodes during this fourteen-week period (Docket No. 7, pp. 148-51 of 578). Again, this frequency is not enough to satisfy the "more than weekly" criteria established by Listing 11.03. 20 C.F.R. Part 404, Subpart P, Appendix 1, 11.03. Although Plaintiff alleges he suffered from seizures once a week and reported as much to his doctors (Docket No. 9, p. 12 of 16), the medical evidence, when taken as a whole, does not support this claim.

Plaintiff also calls to this Court's attention Mrs. Patton's record of Plaintiff's general claims of dizziness, headaches, and lack of energy (Docket No. 9, p. 10 of 16). According to Dr. Goren, these symptoms cannot be said to constitute an actual seizure (Docket No. 7, p. 567 of 578). Plaintiff offers no contradictory opinion as to this conclusion, except to say that those symptoms should qualify as "complicating factors" to Plaintiff's seizure disorder (Docket No. 9, p. 9 of 16). Although the Listings require documentation of all "associated phenomena," it is clear that these symptoms do not constitute, on their own, an episode which would help satisfy the frequency requirements. 20 C.F.R. Part 404, Subpart P, Appendix 1, 11.02, 11.03.

Furthermore, as noted by the ALJ, Plaintiff underwent two Physical Residual Functional

Capacity Assessments during the relevant time period, one on November 20, 2006, with Dr. Villanueva, and one on March 13, 2007, with Dr. Hill (Docket No. 7, pp. 265-80 of 578). Both state examiners came to the same conclusion: Plaintiff's impairment did not meet or equal the Listings (Docket No. 7, pp. 260, 277 of 578). These evaluations provide further evidence of Plaintiff's medical improvement during this time, despite his allegations to the contrary.

ALJ Lucas makes mention of Plaintiff's 2009 depth electrode study (Docket No. 7, p. 23 of 578), which found, after nearly thirty days of continuous monitoring, that Plaintiff had "very frequent subclinical seizures" (Docket No. 7, p. 435 of 578). So, too, does Plaintiff note the results of this study (Docket No. 9, p. 13 of 16). By definition, "subclinical" means "so slight as to remain unnoticed or undetectable." ATTORNEYS' DICTIONARY OF MEDICINE, S-110340 (2009). What Plaintiff *fails* to note is the remainder of the test results, which found that, during the twenty-three days of recording, Plaintiff "did *not* have any of his habitual/spontaneous seizures" and did not respond with a seizure even upon direct electrical stimulation (Docket No. 7, p. 435 of 578) (emphasis added).

When taken as a whole, it is clear that there was substantial evidence upon which the ALJ could base his conclusion that Plaintiff was no longer under a disability as of  November 1, 2006. The evidence shows Plaintiff failed to meet the frequency criteria set forth in Listings 11.02 and 11.03. Therefore, Plaintiff's allegation is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### 3.    ADDITIONAL ISSUES

Throughout his Brief, Plaintiff makes mention of two other issues, namely the ALJ's failure to: (1) account for Plaintiff's depression; and (2) obtain testimony from a VE during the second administrative hearing (Docket No. 9). Neither of these issues bear merit.

Upon review of the evidence, it is clear that Plaintiff's depression caused him no more than minimal limitation. ALJ Lucas discussed, at length, Plaintiff's mental health status and corresponding testing (Docket No. 7, pp. 20, 21 of 578). On October 22, 2008, Dr. Tesar diagnosed Plaintiff with an adjustment disorder with disturbance of conduct and emotions, cannabis abuse/dependence, alcohol dependence/abuse in remission, intermittent explosive disorder in remission, and personality disorder with paranoid features (Docket No. 7, p. 305 of 578). However, Dr. Tesar also noted that Plaintiff was frustrated, not depressed, and recommended no further psychiatric evaluation (Docket No. 7, pp. 304-05 of 578). In March 2009, Dr. Haut diagnosed Plaintiff with significant depression, overt stress/distress, social isolation, and preoccupation with physical concerns (Docket No. 7, p. 296 of 578). However, Plaintiff performed very well on evaluative tests (Docket No. 7, pp. 295-96 of 578).

These results seem in line with Plaintiff's two Psychiatric Review Techniques performed in 2006 and 2007. During both evaluations, Plaintiff was found to have no medically determinable impairment (Docket No. 7, pp. 251, 281 of 578). Given Plaintiff's test results and the lack of any evidence suggesting limitations based on his mental state, Plaintiff's allegation of error is without merit.

Likewise, Plaintiff's allegation that ALJ Lucas erred by not obtaining the testimony of a VE at the second administrative hearing is without merit. On remand, the Appeals Council instructed that, "[i]f warranted by the expanded record, the [ALJ] will obtain (supplemental) evidence from a vocational expert to clarify the effect of the assessed limitations on [Plaintiff's] occupational base" (Docket No. 7, p. 373 of 578). ALJ Lucas requested the presence of VE Yi at the second hearing, but did not take his testimony (Docket No. 7, p. 16 of 578). In his decision, the ALJ clearly stated his reasons for this:

> Upon review of the new and material evidence since the Appeals Council's review of the undersigned's previous decision, the undersigned finds that supplemental vocational expert testimony is not necessary because the evidence indicates even more improvement in the claimant's functioning since the October 2009 decision. Accordingly, the undersigned finds that Mr. Holderead's impartial vocational expert testimony is still relevant at this time.

(Docket No. 7, p. 24 of 578). Based on the ALJ's unchanged opinion, it was unnecessary to solicit testimony from VE Yi. This decision was well within the ALJ's discretion. Accordingly, Plaintiff's assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   September 9, 2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.